*408 OPINION.
Sternhagen:
The petitioner claims that its tugs were paid in for stock or shares and that they had at such time an actual cash value of $1,000,000, and hence, under section 32G of the Revenue Act of 1918, this amount is included in its statutory invested capital. The Commissioner asserts that, however this may be, the situation is within section 331, whereby the petitioner’s invested capital is limited as to the tugs by the amount allowable to the old corporation. The petitioner insists that section 331 is not applicable because this case is not within its letter or intendment.
The plan of the war and excess-profits tax is to impose such tax upon the income above an established return on the statutory invested capital. In the ordinary case invested capital consists of the factors enumerated in section 326. But section 331 was obviously included in the plan in order to jirevent a taxpayer from inflating its statutory invested capital and thus, by including appreciated values not otherwise recognizable, La Belle Iron Works v. United States, 256 U. S. 377, reducing the ratio by which its tax was measured. With no apparent departure from the accepted doctrine that corporate entities were separate from their stockholders, it was recognized that corporate action may be so guided by stockholders that legal ownership may be changed and the measure of tax lia *409 bility contemplated by the statute defeated. In such a situation the statute provides by section 331 that the corporation as reorganized or otherwise changed shall have as its invested capital not the normal items set forth in section 326 but instead the items which would have existed if the change had not been brought about. By classifying such corporation for taxation upon the measure of its predecessor, the possibility of avoiding the intended tax was effectually frustrated. This was a method whereby differences brought about as we have described should be ignored so that the tax should apply equally to those within the general plan of taxation.
To accomplish this, general language had to be employed so as to embrace all cases. The fact that it might embrace an isolated case so peculiar in its facts as not to be within the class normally intended to be covered is an effect common to taxing statutes, and if it requires a remedy it is not by way of strained construction but of legislation. This Board is charged to apply the statute as it finds it, and to assume that Congress intended it to embrace all cases within the ordinary meaning of the language used.
It is not doubted that the old corporation’s invested capital would have included only such amount for tugboats as the Commissioner has allowed. That this remained unaffected by the price which any individual stockholder may have paid for his stock is indubitable. Appreciation of corporate assets usually is reflected in the price of stock while it may not appear in invested capital. La Belle Iron Works v. United States, supra.
Passing to the present corporation, it is not disputed that the tugs and other assets were on January 10, 1919, worth $1,000,000 and paid in for stock or shares. Looking to section 326 alone this would be included in its invested capital from that time forth, for it could hardly be said that, while the old corporation still owned the tugs and included them in its invested capital, the new corporation was also entitled to be regarded as their owner. True, negotiations and arrangements were in progress toward their acquisition by the new company and to that end stock of the old corporation was going into escrow. But we have seen that this does not affect invested capital. From early in 1918 there was a steadily changing ownership of stock, that is, the property of the individual shareholder, but no change in the ownership of the trade or business or the property of the old corporation and no change in its tax status under this statute. Section 331 was of no concern at that time.
It was only when the new corporation came into existence and its problem of invested capital arose that it was concerned with the ownership and value of the tugboats. It then for the first time became important to consider whether there was a “reorganization, *410 consolidation, or change of ownership of a trade or business, or change of ownership of property.” Whether this is a reorganization within the meaning of the Act is not readily answered, for the word is not defined in the Act nor are its inclusions set forth as they subsequently were in the Revenue Act of 1921, section 202 (c) (2). It may be doubted whether it is to be confined to a narrow significance of corporate reorganization. There is little indication that a consolidation took place, except the sketchy testimony of Crowley that the plan was to include the boats of his old company.
It seems clear, however, that on January 10, 1919, there was a change of ownership of the trade or business of operating the.tugs for profit. Up to this point the old corporation was the owner, operating, it is true, through the management of Crowley but by virtue of its own appointment and at its own responsibility. And there was also on that date a change of property in the tugboats. But we can find no change of ownership before that date, and any attempt of the Government to determine a gain or loss or otherwise impose a tax predicated upon a change of ownership would certainly have been unjustified. Mind, it is not a change of interest or control which is the first consideration, but a change of ownership, and this occurs at a time and not vaguely over a period.
Having determined the time as January 10, 1919, we are then to say whether after this change of ownership “ an interest or control in such trade or business or property of 50 per centum or more remains in the same persons, or any of them.” From the findings — all of which are substantially as requested by petitioner’s counsel' — -it appears that from time to time after May 15, 1918, the stockholders of the old corporation deposited their stock in escrow under the agreement. Apparently the holders of 2,857 shares deposited their stock early and received their pro rata share of the $100,000 deposited by the buyers. On January 10,1919, the stock of the old corporation was issued to McGahie, while the old corporation was still owner of the boats. Thus we have a clear fact, immutable before the law, that before the change of ownership of the trade or business or property McGahie had substantially more than a 50 per cent interest or control, not for himself but as the representative of the buyers. Shortly thereafter the ownership was formally transferred to the new corporation, whose stock therefor was issued to the old corporation, and thereupon the old corporation distributed this stock to the same persons who already had a greater than 50 per cent interest. Thus the situation is brought squarely within section 331.
Against these definite facts, each of which was established by these participants deliberately and for their own purpose, we are not at liberty to place an equitable construction to effectuate the alleged broader taxing purpose of Congress. It appears to be quite true that *411 these stockholders have an aggregate investment in their corporation’s business of $1,000,000 and that their corporation’s tax is being determined as though they had invested substantially less, and it may be that the result is a hardship which Congress would not knowingly have imposed. But the statute is in our opinion clearly applicable and leaves no room for construction.
The petitioner returned as income a proportionate part of the amount received from the purchaser of the Hercules in 1920. From the facts disclosed this appears to be error. When the petitioner acquired the vessel or an interest in it, it paid its value and was charged with the knowledge of its sale and the incidental rights affected. The cost fo petitioner was on the basis of a value for the whole vessel of $300,000. It made no profit when in 1920 it received no more than this. How this view may affect the treatment of the old corporation in respect of the sale we need not consider.
The petitioner seeks amortization of its tugboats. No claim therefor was made before June 15, 1924, and its right therefore, if any it had, has lapsed and has not been revived by section 1209, Revenue Act of 1926.
Upon the issues raised we sustain the Commissioner as to the computation of invested capital and amortization, and the petitioner as to the amount received for the Hercules.
Judgment will be entered aceordingly after 10 days'1 notice, under Rule 50.